**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| FEDEX SUPPLY CHAIN LOGISTICS AND ELECTRONICS, INC., | |
| Plaintiff, | C.A. No. 21-72-CFC |
| v. | **JURY TRIAL DEMANDED** |
| VIKING TECHNOLOGIES, LLC, | |
| Defendant. | |

**ANSWER AND COUNTERCLAIMS
OF DEFENDANT VIKING TECHNOLOGIES, LLC**

Defendant Viking Technologies, LLC ("Viking") hereby responds to the Amended Complaint for Declaratory Judgment of Noninfringement of U.S. Patent Nos. 8,888,953 and 10,220,537 ("Amended Complaint") (D.I. 8) filed by Plaintiff FedEx Supply Chain Logistics and Electronics, Inc. ("FedEx"), with the following Answer and Counterclaims:

**ANSWER**

Viking answers and avers as follows with the numbered paragraphs corresponding to the like-numbered paragraphs of the Amended Complaint. Any allegations not expressly admitted, denied, or explained, are denied, and Viking specifically denies that FedEx is entitled to any relief whatsoever from Viking.

**PARTIES**

1.      FedEx is a Delaware corporation with its principal place of business at 700 Cranberry Woods Drive, Cranberry Township, PA 16066.

**ANSWER:** Viking admits the allegations of Paragraph 1 of the Amended Complaint.

2.      Upon information and belief, Viking is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business at 103 South Valley Common, Madison, MS 39110.

**ANSWER:** Viking admits the allegations of Paragraph 2 of the Amended Complaint.

3.      Upon information and belief, including Viking's allegations in the FSC Action, Viking owns all substantial right, title, and interest in the Patents-in-Suit and holds the right to sue and recover damages for infringement thereof, including past infringement. *Id*. ¶ 15.

**ANSWER:** Viking owns all substantial right, title, and interest U.S. Patent Nos. 8,888,953 and

10,220,537 ("Patents-in-Suit") including the right to sue and recover damages for infringement

thereof, including past infringement and therefore admits the allegations of Paragraph 3 of the

Amended Complaint.

## JURISDICTION AND VENUE

4.      This is an action under the Federal Declaratory Judgments Act, 28 U.S.C. § 2201 et seq., against Viking for a declaration that, pursuant to the patent laws of the United States, Title 35 of the United States Code, FedEx does not infringe the claims of the Patents-in-Suit.

**ANSWER:** Viking admits that this is an action under the Federal Declaratory Judgments Act, 28

U.S.C. § 2201 *et seq.*, against Viking for a declaration that FedEx does not infringe the claims of

U.S. Patent Nos. 8,888,953 and 10,220,537.  Viking denies any remaining allegations of Paragraph

4 of the Amended Complaint.

5.      Jurisdiction as to these claims is conferred on this Court by 28 U.S.C. §§ 1331, 1338, 2201, and 2202 because this Court has exclusive jurisdiction over declaratory judgment claims arising under the patent laws of the United States pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202. This action further arises under the patent laws of the United States, 35 U.S.C. § 271, *et seq.*

**ANSWER:** Viking admits that jurisdiction is conferred on this Court by 28 U.S.C. §§ 1331, 1338,

2201, and 2202 because the claims contained in the Amended Complaint arise under the patent

laws of the United States, 35 U.S.C. § 271, *et seq.*  Viking denies any remaining allegations of

Paragraph 5 of the Amended Complaint.

6.      This Court has personal jurisdiction over Defendant Viking at least because of its continuous and systematic contacts with the State of Delaware and with this District.  Viking has

filed at least four patent infringement lawsuits in this District.  Viking has established minimum contacts with the forum and the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

**ANSWER:**  Viking admits that, for purposes of this action only, this Court has personal jurisdiction over Viking.  Viking denies any remaining allegations of Paragraph 6 of the Amended Complaint.

7.     Venue is proper in this jurisdiction under 28 U.S.C. §§ 1391 and 1400(b), at least because Viking purposefully directed activities to this District.

**ANSWER:**  Viking admits that, for purposes of this action only, venue is proper in this Court. Viking denies any remaining allegations of Paragraph 7 of the Amended Complaint.

8.     An actual controversy exists between Viking and FedEx as to whether FedEx infringes the Patents-in-Suit.  In its complaint against FSC, Viking alleges that FSC infringes at least claims 1 and 8 of the '953 patent and claims 1 and 9 of the '537 patent.

**ANSWER:**  Viking admits that an actual controversy exists between Viking and FedEx as to whether FedEx infringes the Patents-in-Suit.  Viking admits that in its complaint against FedEx Supply Chain, Inc., 1:20-cv-01511-CFC (D. Del.), Viking alleged infringement of at least claims 1 and 8 of the '953 Patent and claims 1 and 9 of the '537 Patent.  Viking denies any remaining allegations of Paragraph 8 of the Amended Complaint.

9.     FedEx denies that FedEx infringes any claim of the Patents-in-Suit.

**ANSWER:**  Viking admits that FedEx denies that it infringes any claim of the Patents-in-Suit. Viking denies any remaining allegations of Paragraph 9 of the Amended Complaint.

10.     On information and belief, Viking has engaged in substantial efforts to enforce the Patents-in-Suit, including filing the FSC Action against FSC based on the alleged conduct of FedEx. FedEx has a reasonable apprehension that Viking will commence litigation against FedEx asserting infringement of the claims of the Patents-in-Suit.

**ANSWER:**  Viking admits that it has engaged in efforts to enforce the Patents-in-Suit.  Viking also admits that, as part of the Counterclaims contained herein, it is asserting that FedEx has infringed the Patents-in-Suit.  Viking denies any remaining allegations of Paragraph 10 of the Amended Complaint.

11.     There is an immediate, real, and substantial justiciable controversy between FedEx and Viking relating to whether FedEx infringes any claims of the Patents-in-Suit.  Without waiver of any rights, FedEx brings this declaratory judgment action seeking a declaration that FedEx does not infringe any claims of the Patents-in-Suit.

**ANSWER:**  Viking admits that a justiciable controversy exists between FedEx and Viking relating to whether FedEx infringes any claims of the Patents-in-Suit.  Viking admits that FedEx has brought this declaratory judgment action seeking a declaration that FedEx does not infringe any claims of the Patents-in-Suit.  Viking denies any remaining allegations of Paragraph 11 of the Amended Complaint.

## PATENTS

12.     The '953 patent is entitled "Method and Apparatus for Display Screen Shield Replacement" and was issued by the U.S. Patent and Trademark Office on November 8, 2014. Viking asserts that it is the owner by assignment of the '953 patent.  A true and correct copy of the '953 patent is attached hereto as Exhibit 1.

**ANSWER:**  Viking admits the allegations of Paragraph 12 of the Amended Complaint.

13.     The '537 patent is entitled "Method and Apparatus for Display Screen Shield Replacement" and was issued by the U.S. Patent and Trademark Office on March 5, 2019.  Viking asserts that it is the owner by assignment of the '537 patent.  A true and correct copy of the '537 patent is attached hereto as Exhibit 2.

**ANSWER:**  Viking admits the allegations of Paragraph 13 of the Amended Complaint.

## BACKGROUND

14.     Cellular telephones and tablet computing devices manufactured by companies such as Apple, Samsung, and Google have a display assembly that provides users with an interface for

viewing and interacting with the device.  The display assembly is typically covered by a hardened layer of protective glass, which is secured in place by an adhesive layer.

**ANSWER:**  Viking admits that certain cellular telephones and tablet computing devices that provide users with a touch panel display assembly are manufactured and sold by companies such as Apple, Samsung, and Google.  Viking also admits that the display assemblies used on those devices include a protective, transparent cover usually made of hardened glass that is secured to other components in the display assembly by an optically transparent adhesive layer.  Viking denies any remaining allegations of Paragraph 14 of the Amended Complaint.

15.     When the protective glass layer is damaged, depending on the nature of the damage, there is a possibility the display assembly could be repaired.  Before the display assembly can be repaired, the glass layer may need to be removed.  Because the glass layer is bonded to the rest of the display assembly with an adhesive layer, removing the broken protective glass may be accomplished by heating the assembly to soften the adhesive and then cutting through the adhesive layer.  The cutting may be accomplished manually—by hand—or by using a machine, and may be accomplished using any number of tools, from a blade to a fishing line.  If the repair is successful, the repaired assembly can then be reused on a phone or tablet computing device.

**ANSWER:**  Viking admits that when the protective glass layer of an electronic display is damaged, depending on the nature of the damage, there is a possibility the display assembly could be repaired.  Viking denies that any of the damaged glass that remains must be removed.  Viking also admits that the protective glass layer may be removed from the display assembly by heating the assembly and cutting through the optically transparent adhesive layer by using various cutting tools, including but not limited to a cutting blade or a fishing line, moved by hand or machine.  Viking further admits that, if the underlying electronic display is suitable for reuse, a new protective glass layer may be adhered to the electronic display to make a display assembly that can be used in a smartphone or tablet.  Viking denies any remaining allegations of Paragraph 15 of the Amended Complaint.

16.     During the breakage or removal process, broken glass shards may lodge into the display assembly and cause damage.  When this happens, the display assembly may no longer be repaired.

**ANSWER:**  Viking admits that when the protective glass layer of a display assembly is broken or when a broken protective glass layer of a display assembly is removed from the underlying electronic display, shards of glass may lodge into the underlying electronic display and cause damage to the electronic display.  Viking also admits that, when this occurs, the electronic display may no longer function suitably for reuse.  Viking denies any remaining allegations of Paragraph 16 of the Amended Complaint.

17.     FedEx Corp. acquired GENCO Distribution System, Inc in 2015. Prior to that acquisition, GENCO, in 2010, had previously merged with ATC Technology Corp. ("ATC"), through which ATC Logistics & Electronics became part of GENCO.  ATC Logistics & Electronics, Inc. ("ACTLE"), which was later, in 2017, renamed as FedEx Supply Chain Logistics and Electronics, Inc., was, since 2007, and is to this day, a Delaware Corporation.  ACTLE was involved in the phone repair business until around 2018.

**ANSWER:**  Viking is without knowledge or information sufficient to form a belief as to the allegations contained in Paragraph 17 of the Amended Complaint and therefore denies the allegations of Paragraph 17 of the Amended Complaint.

18.     At no time since early 2018 has FedEx engaged in removing or replacing glass display screens in display assemblies by procuring display assemblies in which the display screens have been replaced or removed or otherwise.

**ANSWER:**  Upon information and belief, since at least 2018 FedEx has continued to engage in smartphone and/or tablet repair work for various third-party entities, including but not limited to U.S. Cellular, AT&T Mobility, and SquareTrade, that involved the replacement of damaged display assemblies with display assemblies remanufactured using the patented process of the Patents-in-Suit.  Viking therefore denies the allegations of Paragraph 18 of the Amended Complaint.

## CAUSES OF ACTION
### First Cause of Action
### (Declaratory Judgment of Noninfringement of the '953 Patent)

19.     FedEx repeats and re-alleges each and every allegation of paragraphs 1–18 as though fully set forth herein.

**ANSWER:**  Viking repeats its responses to the allegations of Paragraphs 1–18 of the Amended

Complaint as if set forth fully herein in response to Paragraph 19 of the Amended Complaint.

20.     Based on the facts and allegations set forth above, there is an actual, justiciable, substantial, and immediate controversy between the parties regarding the alleged infringement of the '953 patent.  Viking has accused FSC of infringing one or more claims of the '953 patent in the FSC Action, thereby presenting an actual, justiciable, substantial, and immediate controversy between the parties regarding whether FedEx infringes any claim of the '953 patent.

**ANSWER:**  Viking admits that a justiciable controversy exists between FedEx and Viking relating

to whether FedEx infringes any claims of the '953 Patent.  Viking admits that in its complaint

against FedEx Supply Chain, Inc., 1:20-cv-01511-CFC (D. Del.), Viking alleged infringement of

at least claims 1 and 8 of the '953 Patent.  Viking denies any remaining allegations of Paragraph

20 of the Amended Complaint.

21.     FedEx does not infringe, and has not infringed, any claim of the '953 patent.

**ANSWER:**  Viking denies the allegations of Paragraph 21 of the Amended Complaint.

22.     For example, Viking's primary allegation is that FedEx infringes "pursuant to 35 U.S.C. § 271(g), by selling in, offering to sell in, using in, or importing into the United States display assemblies manufactured or otherwise produced using a process that practices at least one claimed method of the '953 Patent."  FSC Action Compl., D.I. 1 ¶ 27.  Viking alleges that "FedEx sells, offers to sell, uses and/or imports display assemblies that are remanufactured, either in the United States or abroad, using the patented method of the '953 Patent, including by providing remanufactured display assemblies for smartphones and tablets at its mobile device repair facilities throughout the United States, and by mail-in service."  *Id.*

**ANSWER:**  Viking admits that in its complaint against FedEx Supply Chain, Inc., 1:20-cv-01511-

CFC (D. Del.), Viking alleged that "pursuant to 35 U.S.C. § 271(g), by selling in, offering to sell

in, using in, or importing into the United States display assemblies manufactured or otherwise produced using a process that practices at least one claimed method of the '953 Patent."  Viking also admits that in its complaint against FedEx Supply Chain, Inc., 1:20-cv-01511-CFC (D. Del.), Viking alleged that "FedEx sells, offers to sell, uses and/or imports display assemblies that are remanufactured, either in the United States or abroad, using the patented method of the '953 Patent, including by providing remanufactured display assemblies for smartphones and tablets at its mobile device repair facilities throughout the United States, and by mail-in service."  Viking denies any remaining allegations of Paragraph 22 of the Amended Complaint.

23.    Regardless of whether any unidentified third party from whom FedEx may have procured display assemblies practiced the claimed methods, FedEx cannot be held to infringe because Viking's remedy is against those third parties.  As provided in 35 U.S.C. § 271(g): "No remedy may be granted for infringement on account of the noncommercial use or retail sale of a product unless there is no adequate remedy under this title for infringement on account of the importation or other use, offer to sell, or sale of that product."

**ANSWER:**  FedEx cannot escape liability for its infringement based on the quoted language from 35 U.S.C. § 271(g) which is a limitation on remedies.  Further, the quoted language is inapplicable in this action as Viking's infringement allegations are not based on FedEx's non-commercial use or retail sale of products.  Viking therefore denies the allegations of Paragraph 23 of the Amended Complaint.

24.    Regardless of whether any unidentified third party from whom FedEx may have procured display assemblies practiced the claimed methods, FedEx cannot be held to infringe because FedEx exited the display assembly repair business at least as early as some time in 2018 and FedEx's first notice of the existence of the '953 patent was the filing of the FSC action on November 9, 2020.  35 U.S.C. § 287(b) was enacted with § 271(g) and protects entities who innocently infringe under § 271(g). 35 U.S.C. § 287(b) bars all remedies under § 271(g) for any acts that occur before the accused infringer has been given "notice of infringement."  "Notice of Infringement" is defined as "actual knowledge, or receipt by a person of a written notification, or a combination thereof, of information sufficient to persuade a reasonable person that it is likely that a product was made by a process patented in the United States."  Because FedEx had no notice of infringement prior to any of the accused activities, and because Viking has not and cannot allege such notice, FedEx cannot be found to infringe.

8

**ANSWER:**  Viking denies the allegations of Paragraph 24 of the Amended Complaint.  Upon information and belief, since at least 2017 FedEx has continued to engage in smartphone and/or tablet repair work for various third-party entities, including but not limited to U.S. Cellular, AT&T Mobility, and SquareTrade and such repair work included the replacement of damaged display assemblies with display assemblies remanufactured using the patented process of the '953 Patent. Further, Viking's employees and representatives informed Genco /ATC Logistics & Electronics, FedEx's predecessor-in-interest, around 2014, through presentations and brochures, that the process Viking used to remove broken glass from the display assemblies Viking was selling was covered by pending patent applications.

25.     Regardless of whether any unidentified third party from whom FedEx may have procured display assemblies practiced the claimed methods, FedEx cannot be held to infringe because FedEx never made, used, sold, offered for sale, or imported a "product made by a patented process" under 35 U.S.C. § 271(g).  The cell phones and devices FedEx repaired were already manufactured by the manufacturers.  If third parties provided display assemblies to FedEx, those display assemblies were merely repaired display assemblies.  Further, neither the display assemblies nor the cell phones or devices were "made by a patented process," as the claims are not directed at making a product but instead to a method for removing glass.

**ANSWER:**  Viking denies the allegations of Paragraph 25 of the Amended Complaint.

26.     Regardless of whether any unidentified third party from whom FedEx may have procured display assemblies practiced the claimed methods, FedEx cannot be held to infringe because even if the method could be considered to produce a product, that product "(1) [] is materially changed by subsequent processes; or (2) [] becomes a trivial and nonessential component of another product" under 35 U.S.C. § 271(g).

**ANSWER:**  Viking denies the allegations of Paragraph 26 of the Amended Complaint.

27.     Therefore, FedEx requests judgment that it does not infringe any claim of the '953 patent.

**ANSWER:**  Paragraph 27 of the Amended Complaint contains only a request for relief from

FedEx and therefore does not require an answer.  To the extent an answer is required, Viking

denies the allegations of Paragraph 27 of the Amended Complaint.

<u>**Second Cause of Action**</u>
<u>**(Declaratory Judgment of Noninfringement of the '537 Patent)**</u>

28.    FedEx repeats and re-alleges each and every allegation of paragraphs 1–27 as
though fully set forth herein.

**ANSWER:**  Viking repeats its responses to the allegations of Paragraphs 1–27 of the Amended

Complaint as if set forth fully herein in response to Paragraph 28 of the Amended Complaint.


29.    Based on the facts and allegations set forth above, there is an actual, justiciable,
substantial, and immediate controversy between the parties regarding the alleged infringement of
the '537 patent.  Viking has accused FSC of infringing one or more claims of the '537 patent in
the FSC Action, thereby presenting an actual, justiciable, substantial, and immediate controversy
between the parties regarding whether FedEx infringes any claim of the '537 patent.

**ANSWER:**  Viking admits that a justiciable controversy exists between FedEx and Viking relating

to whether FedEx infringes any claims of the '537 Patent.  Viking admits that in its complaint

against FedEx Supply Chain, Inc., 1:20-cv-01511-CFC (D. Del.), Viking alleged infringement of

at least claims 1 and 9 of the '537 Patent.  Viking denies any remaining allegations of Paragraph

29 of the Amended Complaint.


30.    FedEx does not infringe, and has not infringed, any claim of the '537 patent.  FedEx
exited the display assembly repair business by at least 2018, before the '537 patent issued on March
5, 2019, and therefore there is no plausible claim that FedEx infringes, directly or indirectly,
literally or by equivalence, any claim of the '537 patent.

**ANSWER:**  Viking denies the allegations of Paragraph 30 of the Amended Complaint.  Upon

information and belief, since at least 2017 FedEx has continued to engage in repair work for

various third-party entities, including but not limited to U.S. Cellular, AT&T Mobility, and

SquareTrade, that involved the replacement of damaged display assemblies with display assemblies remanufactured using the patented process of the Patents-in-Suit.

31.    Therefore, FedEx requests judgment that it does not infringe any claim of the '537 patent.

**ANSWER:**  Paragraph 31 of the Amended Complaint contains only a request for relief from FedEx and therefore does not require an answer.  To the extent an answer is required, Viking denies the allegations of Paragraph 31 of the Amended Complaint.

## DEMAND FOR JURY TRIAL

32.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure and D. Del. L.R. 38.1, FedEx hereby demands a jury trial as to issues so triable.

**ANSWER:**  FedEx's demand for jury trial is a legal statement that Viking can neither admit nor deny.

## COUNTERCLAIMS

Viking Technologies, LLC ("Viking") hereby asserts the following counterclaims against FedEx Supply Chain Logistics and Electronics, Inc. ("FedEx") for patent infringement of United States Patent Numbers 8,888,953 (the "'953 Patent") and 10,220,537 (the "'537 Patent" and collectively with the '953 Patent, the "Patents-in-Suit"):

## PARTIES

1.      Viking is a limited liability company organized and existing under the laws of the State of Nevada with its principal place of business at 103 South Valley Common, Madison, Mississippi 39110.

2.      As alleged by FedEx in Paragraph 1 of its Amended Complaint, FedEx is a Delaware corporation with its principal place of business at 700 Cranberry Woods Drive, Cranberry Township, PA 16066.

## JURISDICTION AND VENUE

3.      This is an action for patent infringement arising under the Patent Laws of the United States, Title 35 of the United States Code.

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action concerns the infringement of U.S. patents.

5.      On information and belief, FedEx is subject to this Court's specific and general personal jurisdiction because it conducts substantial business in the District of Delaware, directly and/or through intermediaries, including: (i) committing at least a portion of the acts of infringement alleged herein in this District, and (ii) regularly conducting or soliciting business in this District, engaging in other persistent courses of conduct in this District including maintaining

continuous and systematic contacts in this District, availing itself of the privileges of doing business in this District.

6.      Venue is proper in this District under 28 U.S.C. § 1400(b) because FedEx is a Delaware corporation and therefore resides in this District.

## BACKGROUND

7.      The most vulnerable portion of a smart phone or tablet is the protective transparent cover which is typically made of hardened glass.  The underlying display of a smart phone or tablet which is protected by this transparent cover is one of the most expensive components in the device. In the initial years after the advent of the iPhone and Android smartphones, the repair for a display assembly with broken glass cover would involve replacement of the entire display assembly.

8.      The introduction of active-matrix organic light-emitting diode ("AMOLED") displays in smart phones and tablets in 2011 offered better display technology but at a significantly increased price.  This made replacing the entire display assembly when the glass cover broke prohibitively expensive.  After the introduction of AMOLED displays, Assurant, Inc. ("Assurant") approached business partners Kevin Barnett and Teo Chong Teck and asked them to develop a way to repair the glass cover in the touchscreen assembly of smartphones and tablets in order to avoid replacing the entire display assembly.

9.      Messrs. Barnett and Teck designed a cutting machine and a method of using the machine to separate the glass cover from the underlying display without damaging the underlying display.  The machine uses a cutting wire in the adhesive layer between the protective layer and the underlying display.  The machine permits the height of the cutting wire to be adjusted to bring the cutting wire close to the underlying display and through the adhesive layer as the cutting wire traverses an area with broken glass.  Because shards of broken glass often extend into the

intermediate adhesive layer between the glass cover and the underlying display, this prevents the cutting wire from snagging those glass shards in the adhesive layer and damaging the underlying display. Using their technique, the broken glass cover is removed from the display assembly and a replacement touchscreen assembly is manufactured using the recovered underlying display and a new protective glass cover. This is a more efficient and, therefore, more cost-effective approach to fixing a display assembly with a broken glass cover than replacing the entire display assembly.

10.     In 2012 Messrs. Barnett and Teck formed Viking Technologies Company Limited in Hong Kong ("Viking Hong Kong") and opened a factory in China that, using the patented technology, removed the broken glass covers from approximately 10,000 devices a month.

11.     In late 2013, Assurant terminated its relationship with Viking Hong Kong. Viking Hong Kong continued to process broken display assemblies for other customers from 2014 until 2016, but not at the consistent volume it had previously done for Assurant, and eventually ceased operating.

12.     Upon information and belief, since at least 2017 FedEx has engaged in smartphone and/or tablet repair work for various third-party entities, including U.S. Cellular, AT&T Mobility and SquareTrade, that involved the replacement of damaged display assemblies with display assemblies remanufactured using the patented process of the Patents-in-Suit.

13.     On information and belief, around 2014 Viking's employees and representatives informed GENCO Distribution System, Inc., which was acquired by FedEx, through presentations and brochures, that the process Viking used to remove broken glass from the display assemblies Viking was selling was covered by pending patent applications.

14.     Today, broken glass covers are the most common insurance claim and warranty claim for smartphones and tablets and almost 30 million broken display assemblies are replaced

every year, resulting in a $3.4 billion annual market. (https://www.prnewswire.com/news-releases/mobile-myths-cost-consumers-dearly-as-americans-report-spending-3-4-billion-replacing-millions-of-smartphone-screens-last-year-300753419.html, last accessed Mar. 5, 2021.) FedEx's infringement of the Patents-in-Suit has allowed it to capture a share of this replacement market.

## PATENTS-IN-SUIT

### Background

15.    The '953 Patent is entitled "Method and Apparatus for Display Screen Shield Replacement" and was duly issued by the U.S. Patent and Trademark Office on November 8, 2014. Viking is the owner by assignment of the '953 Patent.  It is valid and enforceable, and was duly issued in full compliance with the Patent Laws of the United States, Title 35 of the United States Code.  A copy of the '953 Patent was attached to the Amended Complaint as Exhibit 1.

16.    Viking owns all substantial right, title, and interest in the '953 Patent, and holds the right to sue and recover damages for infringement thereof, including past infringement.

17.    The '537 Patent is entitled "Method and Apparatus for Display Screen Shield Replacement" and was duly issued by the U.S. Patent and Trademark Office on March 5, 2019. Viking is the owner by assignment of the '537 Patent.  It is valid and enforceable, and was duly issued in full compliance with the Patent Laws of the United States, Title 35 of the United States Code.  A copy of the '537 Patent was attached to the Amended Complaint as Exhibit 2.

18.    Viking owns all substantial right, title, and interest in the '537 Patent, and holds the right to sue and recover damages for infringement thereof, including past infringement.

19.    The Patents-in-Suit describe and claim a particular way of using a cutting device, such as a cutting wire, to remove the protective glass cover from a display assembly without

damaging the underlying display, such that the display assembly can be remanufactured using a new protective glass cover.

20.     The claims of the Patents-in-Suit are not directed to abstract ideas and are not merely attempting to limit a method of organizing human activity or an idea itself to a particular technological environment.  The claimed technology (e.g., a method of removing a protective glass cover from a display unit having a glass cover, an electronic display portion, and an intermediate adhesive layer therebetween) are expressly directed to methods of using cutting devices, which are not abstract methods or abstract ideas.  The method of using a cutting device claimed in the Patents-in-Suit exists only in a concrete and tangible form, and the claimed inventions cannot be accomplished through pen-and-paper or the human mind.  As alleged above, the claimed methods provided a technical solution to an existing technical problem.  Accordingly, the claims of the Patents-in-Suit are not directed to an abstract idea.

21.     When viewed as a whole, the claims, including as an ordered combination, are not merely a recitation of well-understood, routine, or conventional technologies or components.  The claimed inventions were not well-known, routine, or conventional at the time of the invention and represent specific improvements over the prior art and existing systems and methods.  The claimed technology (e.g., a method of removing a protective glass cover from a display unit having a glass cover, an electronic display portion, and an intermediate adhesive layer therebetween) was not known in the prior art at the time of the invention, let alone well-known, routine, or conventional.

22.     Claim 1 of the '953 Patent recites:

A method of removing a protective glass top surface from a display unit having a glass top, an electronic display portion, and an intermediate layer therebetween, the display unit defining an axis extending along said intermediate layer, the method comprising the steps of: fixing the display unit in a carriage with the intermediate layer being exposed on all sides; aligning a cutting device in a coplanar relationship with the intermediate layer; biasing the cutting device in the intermediate layer adjacent the electronic display portion

16

and away from the glass, driving the cutting device into the intermediate layer while moving the cutting device and display unit relative to each other along a diagonal direction relative to said display unit axis; advancing the cutting device into the intermediate layer to separate the glass top from the electronic display portion.

23.    Claim 8 of the '953 Patent recites:

A method of separating a protective glass top surface from a display unit having a glass top, an electronic display portion, and an intermediate layer therebetween, the method comprising the steps of: fixing the display unit in a carriage with the intermediate layer being exposed on all sides; aligning a cutting blade in a coplanar relationship with the intermediate layer; biasing the cutting blade in the intermediate layer immediately adjacent the electronic display portion and away from the glass by locating the guide path of the blade below the display; heating a side of the cutting blade facing away from said electronic display portion, and cooling a side of the cutting blade facing toward said electronic display portion; driving the cutting blade into the intermediate layer so that the cutting blade and display unit are moved relative to each other along an axis generally orthogonal to the cutting blade; advancing the cutting blade into the intermediate layer to separate the glass top from the electronic display portion.

24.    Claim 1 of the '537 Patent recites:

A method of removing a protective glass top surface from a display unit having a glass top, an electronic display portion, and a planar intermediate layer therebetween, the method comprising the steps of: fixing the display unit in a carriage with the intermediate layer being exposed on all sides; aligning a cutting device in a coplanar relationship with the intermediate layer; biasing the cutting device in the intermediate layer adjacent the electronic display portion and away from the glass; driving the cutting device into the intermediate layer while moving the cutting device and display unit relative to each other along an axis generally orthogonal to the cutting device; and advancing the cutting device into the intermediate layer to separate the glass top from the electronic display portion.

25.    Claim 9 of the '537 Patent recites:

A method of separating a protective glass top surface from a display unit having a glass top, an electronic display portion, and a planar intermediate layer therebetween, method comprising the steps of: fixing the display unit in a carriage with the intermediate layer being exposed on all sides; aligning a cutting wire in a coplanar relationship with the intermediate layer; biasing the cutting wire in the intermediate layer immediately adjacent the electronic display portion and away from the glass by locating the guide path of the wire below the display; driving the cutting wire into the intermediate layer while moving it reciprocally therethrough so that the cutting device and display unit are moved relative to each other along an axis generally orthogonal to the cutting wire; and advancing the cutting wire into the intermediate layer to separate the glass top from the electronic display portion.

## COUNT I
## (INFRINGEMENT OF THE '953 PATENT)

26.     Viking repeats and re-alleges the allegations of Paragraphs 1–25 above as if fully set forth herein.

27.     On information and belief, FedEx has infringed and continues to infringe one or more claims of the '953 Patent, including but not limited to Claims 1 and 8, pursuant to 35 U.S.C. § 271(g), by selling in, offering to sell in, using in, or importing into the United States display assemblies manufactured or otherwise produced using a process that practices at least one claimed method of the '953 Patent.  FedEx sells, offers to sell, uses and/or imports display assemblies that are remanufactured, either in the United States or abroad, using the patented method of the '953 Patent, including by providing remanufactured display assemblies for smartphones and tablets at its mobile device repair facilities throughout the United States, and by mail-in service.  Since at least 2017 FedEx has continued to engage in repair work for various third-party entities, including but not limited to U.S. Cellular, AT&T Mobility, and SquareTrade, that involved the replacement of damaged display assemblies with display assemblies remanufactured using the patented process of the '953 Patent.  FedEx's use of the display assemblies is of a commercial nature and FedEx does not engage in retail sales of the display assemblies.

28.     As just one non-limiting example, FedEx infringes claim 1 of the '953 Patent by selling, offering to sell, using and/or importing display assemblies that are remanufactured by removing the glass cover from the underlying display for display assemblies for smartphones and tablets at its phone repair and remanufacture facilities.  The remanufacturing processes use a cutting wire as the cutting device and, using a sawing action (typically either in a reciprocating or continuous unidirectional fashion), the cutting device slices through the optically transparent

adhesive layer ("the intermediate layer") between the protective glass cover/top and the underlying display to separate the protective glass cover from the display assembly.

29.     Claim 1 of the '953 Patent requires "fixing the display unit in a carriage with the intermediate layer being exposed on all sides."  As part of the accused remanufacturing processes, the display assembly is secured ("fixed") in a fixture ("carriage") by, for example, securing the display assembly in a clamping mechanism or by securing the display assembly in place on a flat surface using a vacuum and therefore allows the optically transparent adhesive layer ("the intermediate layer") between the protective glass cover and the display to remain exposed so the cutting device can enter, pass completely through, and exit the adhesive layer.

30.     Claim 1 of the '953 Patent also requires "aligning a cutting device in a coplanar relationship with the intermediate layer."  As part of the accused remanufacturing processes, the optically transparent adhesive layer ("the intermediate layer") of the secured display assembly and the cutting device are aligned in the same plane ("coplanar") so that the cutting device can slice through the optically transparent adhesive layer ("the intermediate layer") between the glass and the display.

31.     Claim 1 of the '953 Patent further requires "biasing the cutting device in the intermediate layer adjacent the electronic display portion and away from the glass."  As part of the accused remanufacturing processes, as the cutting device slices through the optically transparent adhesive layer ("the intermediate layer"), the cutting device is biased towards the display (and away from the protective glass cover) at least where the cutting device encounters obstacles such as broken glass and/or hardened adhesive.   The biasing of the cutting device is accomplished by adjusting the height of the cutting device relative to the display and the protective glass cover, the adjustment being made through the operational aspects of the cutting machine or manually by the

19

operator manipulating or otherwise influencing the cutting device height.   Through visual confirmation and the response characteristics of the adhesive layer, the operator can determine when broken glass and other obstacles are encountered.

32.     Claim 1 of the '953 Patent also requires "driving the cutting device into the intermediate layer while moving the cutting device and display unit relative to each other along a diagonal direction relative to said display unit axis."   The accused remanufacturing processes begin with the cutting device being guided into the optically transparent adhesive layer ("the intermediate layer").   To cut through the adhesive layer, the cutting device is typically used like a saw, either in a reciprocating fashion (e.g., with the back and forth motion typical of a handsaw) or unidirectionally (e.g., with the continuous movement typical of a bandsaw).   The cutting device may be driven into the optically transparent adhesive layer ("the intermediate layer") on a diagonal relative to an axis of the display assembly extending along the adhesive layer (*see, e.g.,* '953 Patent, Fig. 7—showing X axis and Y axis).   This is accomplished by setting the display assembly on a diagonal relative to the cutting device or by operator manipulation of the cutting device, such as a flexible wire, to establish at least a portion of the cutting device at a diagonal relative to an axis of the display assembly.

33.     Claim 1 of the '953 Patent also requires "advancing the cutting device into the intermediate layer to separate the glass top from the electronic display portion."   As part of the accused remanufacturing processes, the cutting device is advanced through the optically transparent adhesive layer ("the intermediate layer") to separate the protective glass cover and the display by moving the cutting device and the display assembly relative to each other.

34.     One of ordinary skill in the art would understand that the above-described method is the most common method of performing high volume remanufacture of display assemblies for,

as examples, Samsung smartphone/tablet (e.g, Galaxy S7, Galaxy S8, Galaxy S9, Galaxy S10, Galaxy Note 7, Galaxy Note 8, Galaxy Note 9, Galaxy Note 10) display assemblies  and Apple smartphone/tablet (e.g, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XS, iPhone XR, iPad, iPad Mini) display assemblies.  Not only does a remanufactured display assembly provide a significant cost benefit over procurement of a new replacement display assembly, but the above-described method also provides a significant cost benefit over other known methods of remanufacture.  For example, as noted during prosecution, prior methods of remanufacture were not effective in removing broken glass, thereby jeopardizing recovery of a working display, and effectively increasing the cost of display assembly remanufacturer when using those methods.  *See* '953 Patent File History, September 4, 2014 Amendment and Response under 37 CFR § 1.111, pp. 8–9 ("In brief, though, prior to the inventions described in this application, the practice of removing damaged cover glass from a laminated face, often including a touch-sensitive LCD display unit, from handheld devices such as 'smartphones' and 'tablets', has suffered from deficiencies in their inability to remove the glass when it is shattered.  Shards of that cover glass, when it is shattered, often extend into the intermediate layer between the cover glass and the display, preventing prior machines and their associated methods from successfully removing the cover glass, and also jeopardizing the display.").

35.    Around 2014 Viking's employees and representatives informed Genco/ATC Logistics & Electronics, FedEx's predecessor-in-interest, through presentations and brochures, that the process Viking used to remove broken glass from the display assemblies Viking was selling was covered by pending patent applications, which included U.S. Patent Application No. 13/914,794 that issued as the '953 Patent.

36.     FedEx has directly infringed the '953 Patent and is thus liable for infringement of the '953 Patent pursuant to 35 U.S.C. § 271.  Viking has suffered, and continues to suffer, damage because of FedEx's unlawful infringement of the '953 Patent.  Viking is entitled to recover from FedEx the damages adequate to compensate for such infringement, which have yet to be determined.

## COUNT II
## (INFRINGEMENT OF THE '537 PATENT)

37.     Viking repeats and re-alleges the allegations of Paragraphs 1–36 above as if fully set forth herein.

38.     On information and belief, FedEx has infringed and continues to infringe one or more claims of the '537 Patent, including but not limited to Claims 1 and 9, pursuant to 35 U.S.C. § 271(g), by selling in, offering to sell in, using in, or importing into the United States display assemblies manufactured or otherwise produced using a process that practices at least one claimed method of the '537 Patent.  FedEx sells, offers to sell, uses and/or imports display assemblies that are remanufactured, either in the United States or abroad, using the patented method of the '537 Patent, including by providing remanufactured display assemblies for smartphones and tablets at its mobile device repair facilities throughout the United States, and by mail-in service.  Since at least 2017 FedEx has continued to engage in repair work for various third-party entities, including but not limited to U.S. Cellular, AT&T Mobility, and SquareTrade, that involved the replacement of damaged display assemblies with display assemblies remanufactured using the patented process of the '537 Patent.  FedEx's use of the display assemblies is of a commercial nature and FedEx does not engage in retail sales of the display assemblies.

39.    As just one non-limiting example, FedEx infringes claim 1 of the '537 Patent by selling, offering to sell, using and/or importing display assemblies that are remanufactured by removing the glass cover from the underlying display for display assemblies for smartphones and tablets at its phone repair and remanufacture facilities.   The remanufacturing processes use a cutting wire as the cutting device at its phone repair and remanufacture facilities.   Using a sawing action (typically either in a reciprocating or continuous unidirectional fashion), the cutting device slices through the optically transparent adhesive layer ("the intermediate layer") between the protective glass cover/top and the underlying display to separate the protective glass cover from the display assembly.

40.    Claim 1 of the '537 Patent requires "fixing the display unit in a carriage with the intermediate layer being exposed on all sides."   As part of the accused remanufacturing processes, the display assembly is secured ("fixed") in a fixture ("carriage") by, for example, securing the display assembly in a clamping mechanism or by securing the display assembly in place on a flat surface using a vacuum and therefore allows the optically transparent adhesive layer ("the intermediate layer") between the protective glass cover and the display to remain exposed so the cutting device can enter, pass completely through, and exit the adhesive layer.

41.    Claim 1 of the '537 Patent also requires "aligning a cutting device in a coplanar relationship with the intermediate layer."   As part of the accused remanufacturing processes, the optically transparent adhesive layer ("the intermediate layer") of the secured display assembly and the cutting device are aligned in the same plane ("coplanar") to allow the cutting device to slice through the optically transparent adhesive layer ("the intermediate layer") between the glass and the display.

42.     Claim 1 of the '537 Patent further requires "biasing the cutting device in the intermediate layer adjacent the electronic display portion and away from the glass."  As part of the accused remanufacturing processes, as the cutting device slices through the optically transparent adhesive layer ("the intermediate layer"), the cutting device is biased towards the display (and away from the protective glass cover) at least where the cutting device encounters obstacles such as broken glass and/or hardened adhesive.  The biasing of the cutting device is accomplished by adjusting the height of the cutting device relative to the display and the protective glass cover, the adjustment being made through the operational aspects of the cutting machine or manually by the operator manipulating or otherwise influencing the cutting device height.   Through visual confirmation and the response characteristics of the adhesive layer, the operator can determine when broken glass and other obstacles are encountered.

43.     Claim 1 of the '537 Patent requires "driving the cutting device into the intermediate layer while moving the cutting device and display unit relative to each other along an axis generally orthogonal to the cutting device."  In the accused remanufacturing processes, the cutting device is guided into the optically transparent adhesive layer ("the intermediate layer").  To cut through the adhesive layer, the cutting device is used like a saw, either in a reciprocating fashion (e.g., with the back and forth motion typical of a handsaw) or unidirectionally (e.g., with the continuous movement typical of a bandsaw).  The cutting device is driven into the optically transparent adhesive layer ("the intermediate layer") and advanced through the adhesive layer by moving the cutting device and the display assembly relative to each other such that, under operator control, the movement of the centerline of the cutting wire is generally at a right angle ("orthogonal") relative to the display assembly.

24

44.     Claim 1 of the '537 Patent also requires "advancing the cutting device into the intermediate layer to separate the glass top from the electronic display portion."  As part of the accused remanufacturing processes, the cutting device is advanced through the optically transparent adhesive layer ("the intermediate layer") to separate the protective glass cover and the display by moving the cutting device and the display assembly relative to each other.

45.     One of ordinary skill in the art would understand that the above-described method is the most common method of performing high volume remanufacture of display assemblies for, as examples, Samsung smartphone/tablet (e.g, Galaxy S7, Galaxy S8, Galaxy S9, Galaxy S10, Galaxy Note 7, Galaxy Note 8, Galaxy Note 9, Galaxy Note 10) display assemblies  and Apple smartphone/tablet (e.g, iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, iPhone X, iPhone XS, iPhone XR, iPad, iPad Mini) display assemblies.  Not only does a remanufactured display assembly provide a significant cost benefit over procurement of new replacement display assemblies, but the above-described method also provides a significant cost benefit over other known methods of remanufacture.  For example, as noted during prosecution, prior methods of remanufacture were not effective in removing broken glass, thereby jeopardizing recovery of a working display which effectively increased the cost of display assembly replacement.  *See* '537 Patent File History, February 9, 2015 Amendment and Response under 37 CFR § 1.111, pg. 9 ("In brief, prior to the inventions described in this application, the practice of removing damaged cover glass from a laminated face, often including a touch-sensitive LCD display unit, from handheld devices such as 'smartphones' and 'tablets', has suffered from deficiencies in their inability to remove the glass when it is shattered.  Shards of that cover glass, when it is shattered, often extend into the intermediate layer between the cover glass and the display, preventing prior machines and their associated methods from successfully removing the cover glass, and also jeopardizing the

display.  *In response to at least these deficiencies, the inventor herein devised methods and machines which bias the cutting device toward the display and thus away from the (likely broken) glass, which has real and greatly advantageous effects on the efficacy of the separation process.*") (emphasis added).

46.     Around 2014 Viking's employees and representatives informed Genco /ATC Logistics & Electronics, FedEx's predecessor-in-interest, through presentations and brochures, that the process Viking used to remove broken glass from the display assemblies Viking was selling was covered by pending patent applications, which included U.S. Patent Application No. 13/790,212 that issued as the '537 Patent.

47.     FedEx has directly infringed the '537 Patent and is thus liable for infringement of the '537 Patent pursuant to 35 U.S.C. § 271.  Viking has suffered, and continues to suffer, damage because of FedEx's unlawful infringement of the '537 Patent.  Viking is entitled to recover from FedEx the damages adequate to compensate for such infringement, which have yet to be determined.

## PRAYER FOR RELIEF

WHEREFORE, Viking respectfully requests that this Court enter judgment in its favor as follows:

a.     holding that FedEx has directly infringed literally and/or under the doctrine of equivalents, one or more claims of the Patents-in-Suit;

b.     holding that Viking is entitled to pre-suit damages consistent with, *e.g.*, 35 U.S.C. § 287;

c.     awarding Viking the damages to which it is entitled under 35 U.S.C. § 284 for FedEx's past infringement, including a reasonable royalty and lost profits;

d.     awarding Viking costs and expenses in this action;

26

e.       awarding Viking pre- and post-judgment interest on its damages;

f.       enjoining FedEx from further infringement of the Patents-in-Suit; and

g.       awarding Viking such other and further relief in law or in equity as this Court deems just and proper.

## <u>JURY DEMAND</u>

Viking, under Rule 38 of the Federal Rules of Civil Procedure, requests a trial by jury of any and all issues so triable by right.

Dated:  March 5, 2021

BAYARD, P.A.

OF COUNSEL:

*/s/ Ronald P. Golden III*
Stephen B. Brauerman (#4952)
Ronald P. Golden III (#6254)
600 N. King Street, Suite 400
Wilmington, DE 19801
(302) 655-5000
sbrauerman@bayardlaw.com
rgolden@bayardlaw.com

Mark S. Raskin
John F. Petrsoric
Michael S. DeVincenzo
Elizabeth Long
KING & WOOD MALLESONS LLP
50z0 5th Avenue, 50th Floor
New York, New York 10110
(212) 319-4755
mark.raskin@us.kwm.com
john.petrsoric@us.kwm.com
michael.devincenzo@us.kwm.com
elizabeth.long@us.kwm.com

*Attorneys for Defendant/Counterclaim Plaintiff Viking Technologies, LLC*